**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

THERESA GERACI,

                        Plaintiff,                1:16-cv-01385 (BKS/DJS)

v.

THE RESTAURANT AT APPLE GREENS, INC.; APPLE
GREENS GOLF COURSE, INC.; AMENIA STEAK
HOUSE, INC.; and JUSTINIONO RODRIGUEZ,
individually,

                        Defendants.

**Appearances:**

*For Plaintiff:*
Steven Fingerhut
H. Joseph Cronen
Phillips & Associates, PLLC
45 Broadway, Suite 620
New York, NY 10006

*For Defendant The Restaurant at Apple Greens, Inc. and Amenia Steak House, Inc.:*
Ryan T. Donovan
Ryan E. Manley
Harris, Conway & Donovan, PLLC
5 Clinton Square
Albany, NY 12207

*For Defendant Apple Greens Golf Course, Inc.:*
Benjamin W. Hill
Joshua R. Friedman
Dreyer Boyajian LLP
75 Columbia Street
Albany, NY 12210

*For Defendant Justiniono Rodriguez:*
Samuel C. Breslin
Breslin Law Group, PLLC
5 Clinton Square, Suite 4
Albany, NY 12207

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

Plaintiff Theresa Geraci brings this action against Defendants The Restaurant at Apple

Greens, Inc. (the "Apple Greens Restaurant" or "Restaurant"), Apple Greens Golf Course, Inc.

(the "Apple Greens Golf Course" or "Golf Course"), Amenia Steak House, Inc. ("Amenia," and

together with the Restaurant and the Golf Course, the "Entity Defendants"), and Justiniono

"Justin" Rodriguez, alleging discrimination in employment on the basis of age. (Dkt. No. 4). She

brings claims for discrimination and retaliation against the Entity Defendants under the Age

Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. §§ 621–634;

additionally, she asserts claims for discrimination and retaliation against all Defendants and an

aiding-and-abetting claim against Defendant Rodriguez under the New York Human Rights Law

("NYHRL"), N.Y. Exec. Law §§ 290–301. (*Id.* ¶¶ 59–74). Plaintiff seeks compensatory and

punitive damages and declaratory relief. (*Id.* at 12–13). Defendants move for summary judgment

under Rule 56 of the Federal Rules of Civil Procedure, (Dkt. Nos. 42, 44, 46), arguing, among

other things, that Plaintiff's federal statutory claims fail because of the lack of interconnection

between the Entity Defendants and the small number of individuals they employed during the

relevant time period, (Dkt. No. 42-11, at 12–14; Dkt. No. 44-2, at 9–16).

The Court held oral argument on the motions on December 11, 2018. Before oral

argument, the Court issued a text order directing the parties to "be prepared to address whether

there is a material issue of fact regarding whether the 20-employee minimum in 29 U.S.C. 630(b)

has been met with respect to the Defendants Restaurant at Apple Greens, Inc. and Amenia Steak

House, Inc." (Dkt. No. 61). After oral argument, the Court allowed the parties to supplement the

record on the number of employees at the Restaurant and Amenia, and granted Plaintiff's later

request for an extension of time to supplement the record. (Dkt. No. 63). Plaintiff and Defendants Apple Greens Restaurant and Amenia have submitted supplemental briefing and evidence on that issue. (Dkt. Nos. 64, 65, 66). For the reasons set forth below, the motions are granted.

## II.    FACTS[1]

### A.    Defendants' Businesses

#### 1.    Apple Greens Restaurant and Golf Course

David and Judi Roehrs have owned and managed Defendant Apple Greens Golf Course in Highland, New York, since 1995. (Dkt. No. 44-4, ¶ 3). In 1997 or 1998, the Roehrs constructed a building on the Golf Course, which they eventually used as a restaurant. (*Id.* ¶ 4). In 2003, they decided to leave the restaurant business and started leasing the building to other businesses. (*Id.* ¶ 5). In 2010, Maria Intrieri entered into a lease agreement with Clintondale Food & Catering, Inc., a corporation wholly owned by the Roehrs, to lease the building for the purpose of operating her restaurant business, Defendant Apple Greens Restaurant. (*Id.* ¶ 6). As discussed in further detail below, Plaintiff worked at Defendant Apple Greens Restaurant in October and November 2014 and then again from April to December 2015. (Dkt. No. 42-8, at 55, 75, 140, 158). Plaintiff testified that she did not meet or see Intrieri at the Restaurant in 2014, and that Intrieri "didn't have a role." (Dkt. No. 42-8, at 75–76). Plaintiff learned at some point that Intrieri was the Restaurant's owner, but she "never ever saw Maria" at the Restaurant in 2014 or 2015. (*Id.* at 149). Intrieri testified that, when the Restaurant first opened in 2010, she

---

[1] The facts have been drawn from Defendants' statements of material facts (Dkt. Nos. 42-10, 44-1, 46-2), Plaintiff's responses thereto (Dkt. Nos. 50, 53, 56), Plaintiff's counterstatements of facts (Dkt. Nos. 50, 53, 56), Defendant Golf Course's reply thereto (Dkt. No. 57), the parties' supplemental declarations (Dkt. Nos. 64-2, 66-1), and the attached exhibits and affidavits. The facts are undisputed or taken in the light most favorable to Plaintiff, unless otherwise noted.

"was there and helped clean, dish wash, order food"; she "was not there full-time but [she] was frequently going to The Restaurant." (Dkt. No. 44-3, at 20–21, 32).

The Restaurant, which Intrieri has owned since 2010, is a separate legal entity from the Roehrs-owned Golf Course; neither the Golf Course nor the Roehrs have any ownership interest in the Restaurant. (Dkt. No. 44-1, ¶¶ 12–13, 49; Dkt. No. 44-3, at 16). They do not share any employees.[2] (Dkt. No. 44-1, ¶ 75). The Golf Course does not have a liquor license and is not named on the Restaurant's liquor license. (Dkt. No. 44-1, ¶ 53). According to Plaintiff's testimony, the Restaurant would close when the Golf Course was closed. (Dkt. No. 42-8, at 86–87). Mr. Roehrs testified, however, that the Restaurant's operating hours were at the Restaurant's discretion and that the Restaurant was sometimes open when the Golf Course was closed. (Dkt. No. 44-3, at 91, 95–96). Plaintiff acknowledged that the Golf Course did not "specifically set our schedule." (Dkt. No. 42-8, at 86). As a courtesy between the two companies, the Golf Course offered free rounds of golf to Restaurant employees, and the Restaurant offered discounted food and beverages to Golf Course employees. (Dkt. No. 44-1, ¶ 59). The Roehrs regularly ate at the Restaurant and paid for their meals, albeit at a discounted rate. (Dkt. No. 44-4, ¶ 7; Dkt. No. 42-8, at 83–84).

The Golf Course organized weekly fundraising events called "outings." (Dkt. No. 42-8, at 347–49). A group would rent the course, and the Restaurant would provide food and beverage service to the golfers. (*Id.*).[3] The Golf Course would provide a list of outings in advance and coordinate with the Restaurant about ordering food and beverages. (*Id.* at 87). During the outings, Restaurant staff would ride around the Golf Course and serve beverages to the golfers.

---

[2] Defendant Rodriguez was not an employee of the Golf Course. (Dkt. No. 44-1, ¶ 26).

[3] Plaintiff testified that, during such outings, the Restaurant could serve other customers if the Golf Course remained open, but for big outings, "the whole golf course [was] shut down for outside golfers." (Dkt. No. 42-8, at 349).

(*Id.* at 58). Plaintiff testified that for such outings Restaurant staff used "the carts from the golf course," and that for "a big outing . . . more than one cart" was needed.[4] (Dkt. No. 42-8, at 57–58; *see also id.* at 315–16). Restaurant staff received tips for the food and alcohol served during the outings. (*Id.* at 316–17). The Golf Course did not receive any of the profits from the Restaurant's sale of beverages to golfers from the beverage cart.[5] (Dkt. No. 44-1, ¶ 55).

The Golf Course and the Restaurant had a profit-sharing arrangement, whereby the Golf Course received 10 percent of profits made by the Restaurant from catering certain nongolf events (such as weddings or baby showers) held on the grounds of the Golf Course; the 10 percent share was compensation for use of the Golf Course's pavilion, tables, and chairs. (*Id.* ¶ 56; Dkt. No. 44-3, at 99–100). For such catering events, the Golf Course did not have any input on the choice of food and beverages provided by the Restaurant; customers would arrange the food menu directly with the Restaurant without any involvement from the Golf Course.[6] (Dkt. No. 44-1, ¶¶ 57–58).

Plaintiff has acknowledged that Mr. Roehrs did not have a human resource role at the Restaurant. (Dkt. No. 42-8, at 337–38). Similarly, Mr. Roehrs explained that he and his wife "had absolutely no role in the Restaurant's hiring/firing of employees, human resources,

---

[4] Defendant Golf Course disputes this; according to its witnesses, the "Restaurant used its own beverage cart and was generally not permitted to use the Golf Course's carts except as a courtesy when the Restaurant's beverage cart broke down." (Dkt. No. 57, ¶ 9; Dkt. No. 44-3, at 115–16). The Court notes that Plaintiff and her daughter Caroline Spiegel testified that the beverage cart was owned by the Restaurant, (Dkt. No. 42-8, at 357; Dkt. No. 42-9, at 13), and that the lease between Clintondale Food & Catering and Intrieri permitted the Restaurant to use and operate a motorized "beverage cart," (Dkt. No. 44-4, at 11). As discussed below, *see infra* Part IV.B.1, the ultimate ownership of the carts is not material.

[5] According to Plaintiff's testimony, Geraldine Rifenburgh and Defendant Rodriguez told her that Mr. Roehrs "took a percentage of the profits from the outing, from the restaurant part of it." (Dkt. No. 42-8, at 346). Defendants dispute this, citing Mr. Roehrs' testimony that the Golf Course did not receive any percentage of the Restaurant's profits from the outings. (Dkt. No. 44-3, at 99).

[6] In her affidavit, Kerri Spiegel—one of Plaintiff's daughters who also worked at Amenia—asserted that "Mr. Roehrs and other employees of the Golf Course would give [her] instructions regarding events on the Golf Course which we were required to cater." (Dkt. No. 48-4, ¶ 21). Kerri Spiegel, however, does not provide any context or explain what the instructions were.

accounting, tax filing, purchasing, staffing, payroll, or any other meaningful function besides that of landlord of the Restaurant Premises." (Dkt. No. 44-4, ¶ 19). Plaintiff does not dispute that the Restaurant and the Golf Course maintain entirely separate payroll systems, employee records, and insurance.[7] (Dkt. No. 50, ¶¶ 62–64).

According to Plaintiff's testimony, the Restaurant did not require employees to wear a uniform, and Plaintiff was free to wear what she wanted. (Dkt. No. 42-8, at 335). She testified, however, that the Golf Course "had a problem with short shorts out on the beverage carts" and asked Restaurant employees not to wear short shorts on the Golf Course. (*Id.* at 336). Further, Plaintiff testified that she was told by Defendant Rodriguez that Ms. Roehrs "didn't want anybody wearing provocative clothes" inside the restaurant. (*Id.* at 336–37). At his deposition, Mr. Roehrs stated that he "[n]ever" enforced a dress code at the Restaurant but explained that the Golf Course had a dress code for anyone—including Restaurant employees—that set foot on the Golf Course. (Dkt. No. 44-3, at 118–19).

### 2.    Amenia Steak House

Plaintiff worked at Defendant Amenia from November 2014 to March 2015. (Dkt. No. 42-8, at 95–97). Amenia is a one-story steak house owned by Intrieri and Geraldine Rifenburgh. (Dkt. No. 42-8, at 98–99, 117-18; Dkt. No. 44-3, at 15–16; Dkt. No. 42-1, ¶ 2). It opened in September 2014. (Dkt. No. 44-3, at 42). Plaintiff testified that Intrieri "didn't really have a role" at the steak house; she was "the actual owner" but "never an active owner." (Dkt. No. 42-8, at 116–17). Similarly, Intrieri testified: "I was going there but I was not exactly a worker. I was just paying attention to make sure that everything was functioning properly and Geraldine was

---

[7] Based on Mr. Roehrs' purported intervention in Plaintiff's shift change and the Roehrs' purported enforcement of a dress code at the Restaurant, Plaintiff disputes the assertion that "[n]o Golf Course owner or employee played any role in the Restaurant's labor relations." (Dkt. No. 50, ¶ 61). Plaintiff's factual assertions are addressed below. *See infra* Part IV.B.

there." (Dkt. No. 44-3, at 44). She added: "I was the owner and I was there not doing any work but to make sure everything was functioning properly and that [t]he [r]estaurant was functioning." (*Id.*). The Golf Course had no involvement in Amenia's business, and no Golf Course owner or employee had any financial interest in it. (Dkt. No. 44-1, ¶¶ 29, 51).

### 3.    Number of Employees at the Restaurant and Amenia

#### a.    October–November 2014

Intrieri testified that there were "about seven" workers at Amenia when the steak house opened in September 2014. (Dkt. No. 44-3, at 45). That month, Plaintiff applied for a position at the Apple Greens Restaurant and was then hired and trained by employee Jacquelyn Borello. (Dkt. No. 42-10, ¶ 4; Dkt. No. 42-4, ¶ 9; Dkt. No. 42-8, at 40, 49–55, 310). When Plaintiff first started at the Restaurant in October and November 2014, she worked with Defendant Rodriguez and two other individuals: Fernando Linares, a cook; and David Soto, a dishwasher.[8] (Dkt. No. 42-8, at 74). She explained that "[f]or the most part, it was just [Defendant Rodriguez] and myself the majority of the time" and that there were no other servers or bartenders that worked at the Restaurant during that time. (*Id.* at 74–75). The Restaurant closed down for the 2014 season around Thanksgiving of that year. (*Id.* at 75).

#### b.    November 2014–March 2015

Plaintiff began filling in for shifts at Amenia at the end of November 2014 and worked there full time from December 2014 to the end of March 2015. (*Id.* at 90–97, 100, 140). On her first day, the only other people working there were Defendant Rodriguez (who "was cooking"), a girl named Jeanie, and a "young guy" who had "just walked in the door that day." (*Id.* at 93–94). Plaintiff "assum[ed] the restaurant just opened because there really wasn't any workers." (*Id.* at

---

[8] These nondefendants' last names are specified in Plaintiff's supplemental declaration and Defendants' paycheck records. (*See* Dkt. No. 64-2, ¶ 5; Dkt. No. 64-1).

94). Later, in December, "it built up to more employees," (*id.*), but Plaintiff could not "remember exactly who was there," (*id.* at 95). She recalled a manager named Jenny, who "was here and there, but for the most part, . . . was out with a back injury." (*Id.* at 94.) Plaintiff's two daughters, Caroline and Kerri Spiegel, also worked at Amenia in December 2014. (*Id.* at 94–95).

Plaintiff testified the following individuals worked at Amenia from December 2014 to March 2015: Defendant Rodriguez (cook); David Soto (dishwasher); Fernando Linares (cook); Javier Padilla (cook); Oscar Hernandez (cook); Michelle Mayer (server/bartender); Michelle Mayer's niece, Michelle (server); Michelle Mayer's daughter, Aryanna Lawrence (hostess); Michelle Mayer's son, George Mayer (server); Plaintiff's daughter, Caroline Spiegel; Plaintiff's daughter, Kerri Spiegel; Christine Pizzuti (server); Caroline (hostess); and Kathy Colletti (server).[9] (Dkt. No. 42-8, at 99–109, 113–15). In her supplemental declaration, Plaintiff lists the aforementioned individuals and adds three names: Maria Intrieri; Geraldine Rifenburgh; and Geremy Mayer (server).[10] (*See* Dkt. No. 64-2, ¶ 5). She further asserts:

> Based on my memory, I believe that with the exception of Kathy Colletti and Geraldine Rifenburgh, each of the employees listed . . . worked at [Amenia] throughout my entire time as an employee there from approximately December 2014 through April 2015[11] which was a period of approximately 5 months.

(*Id.* ¶¶ 6–8.)

---

[9] Although Plaintiff did not provide the last names of all these individuals at her deposition, their last names are specified in her supplemental declaration and Defendants' paycheck records. (*See* Dkt. No. 64-2, ¶ 5; Dkt. No. 64-1). The court reporter transcribed Michelle Mayer's last name as "Maher," (*see* Dkt. No. 42-8, at 101), but Plaintiff's supplemental declaration and Defendants' paycheck records spell it as "Mayer," (*see* Dkt. No. 64-2, ¶ 5; Dkt. No. 64-1). Other names were similarly misspelled in the deposition transcript. For the sake of consistency, the Court uses the spelling found in Defendants' paycheck records.

[10] The list of coworkers in Plaintiff's supplemental declaration references a "Gerardo Padilla (Cook)" but does not identify anyone named Javier. (Dkt. No. 64-2, ¶ 5). By contrast, at her deposition, Plaintiff made no mention of a "Gerardo" and described Javier as a cook. (Dkt. No. 42-8, at 101). Accordingly, based on Defendants' records and Plaintiff's concordant testimony, the Court has referred to the cook as Javier, not Gerardo, Padilla.

[11] Plaintiff testified, however, that she left Amenia on March 28, 2015. (Dkt. No. 42-8, at 140).

Kathy Colletti asserted in an affidavit submitted by Plaintiff that she worked at Amenia from January to March 2015. (Dkt. No. 48-3). In her affidavit, Kerri Spiegel stated that she began working at Amenia "around the end of 2014 during the winter time," (Dkt. No. 48-4,¶ 3), and she apparently worked there until March or April 2015, (*see id.* ¶¶ 10–11). Caroline Spiegel averred that she worked at Amenia from November 2014 to March 2015. (Dkt. No. 48-5).

### c.      April–December 2015

Plaintiff returned to work at Apple Greens Restaurant in April 2015 and worked there until December 2015. (Dkt. No. 42-8, at 140, 158). According to her testimony, Plaintiff worked with 10 or 11 other individuals at the Restaurant during that period. (Dkt. No. 42-8, at 159). She specifically named the following individuals: Defendant Rodriguez (cook); Germania Soto (cook), Intrieri's niece; Guzman Soto (dishwasher/cook), Intrieri's nephew and Germania's brother; Javier Padilla (cook); Jacquelyn Borello; Justin Swisher; Kerri Spiegel; Caroline Spiegel; and Katlyn, Borello's cousin. (*Id.* at 154, 160–62, 266). In her supplemental declaration, Plaintiff lists the aforementioned individuals and adds Maria Intrieri. (*See* Dkt. No. 64-2, ¶ 9). She further asserts:

> 10. Based on my memory, I believe that with the exception of Caroline Spiegel and Kerri Spiegel, each of the employees listed . . . worked at Apple Greens Restaurant throughout my entire time as an employee there from approximately April 2015 through December 2015 which was a period of approximately 9 months.
>
> 11. I believe Caroline Spiegel worked at Apple Greens Restaurant from about August 2015 through October 2015, and Kerri Spiegel worked at Apple Green Restaurant from about April 2015 through August 2015.

(*Id.* ¶¶ 10–11).

Defendants submitted paycheck records for the Restaurant and Amenia covering the April–December 2015 period. (Dkt. No. 66-2 (list of "Paychecks for All Employees" at the

Apple Greens Restaurant); Dkt. No. 66-3 (list of "Paychecks for All Employees" at Amenia); *see* Dkt. No. 66-4 (chart created by Geraldine Rifenburgh showing months in which each employee of the Apple Greens Restaurant and Amenia received a paycheck)). In a supplemental declaration, Geraldine Rifenburgh explained that her "computer suffered from a virus in March of 2015 and as a result, [she] lost all employment data in the software from January through March of 2015." (Dkt. No. 66-1, ¶ 5). She stated that "at no point between January and March of 2015 did [Amenia] have 20 employees on the payroll," and that "[a]t no time in 2015 did [Amenia] and Apple Greens Restaurant combined have 20 or more employees on the payroll." (*Id.* ¶¶ 6, 9).

According to the paycheck records, Amenia employed the following individuals for the entire April–December 2015 period: Fernando Linares; George Mayer; Geraldine Rifenburgh; Geremy Mayer; Javier Padilla; and Michelle Mayer. Additionally, Jorge Luis Crisanto worked there from May to December 2015; Caroline Berghahn from July to August 2015; Dana Decker in May 2015; David Soto in May 2015; and Oscar Hernandez from July to December 2015. (*See* Dkt. Nos. 66-3, 66-4). Further, according to the records, Geraldine Rifenburgh and Defendant Rodriguez worked at the Apple Greens Restaurant from April to December 2015; Jacquelyn Borello[12] from April to August 2015; Kerri Spiegel from May to August 2015; and Plaintiff from May to November 2015. (*See* Dkt. Nos. 66-2, 66-4).

### d.   January–December 2016

Geraldine Rifenburgh stated in her supplemental declaration that "[a]t no time in 2016 did [Amenia] and Apple Greens Restaurant combined have 20 or more employees on the payroll." (*Id.* ¶ 10). Defendants' paycheck records indicate that between 10 and 12 employees

---

[12] The records list Borello as "Jacquelyn Swisher," after her boyfriend's last name. (*See* Dkt. Nos. 66-2, 66-4).

worked at Amenia from January to December 2016. (*See* Dkt. Nos. 66-3, 66-4). They also show that between 0 and 7 employees worked at the Apple Greens Restaurant during that time. (*See* Dkt. Nos. 66-2, 66-4). Per these records, if the employees of the Restaurant and Amenia are combined, a maximum of 18 employees worked there at any one time that year. (*See* Dkt. Nos. 66-2, 66-3, 66-4).

###### B.    2014 Seasonal Work at the Restaurant

In September 2014, Borello posted a Craigslist advertisement "on behalf of Apple Greens looking for a waitress." (Dkt. No. 42-10, ¶ 3; Dkt. No. 42-4, ¶¶ 1, 9). Plaintiff responded to the advertisement via email, indicating that she was interested in the position. (Dkt. No. 42-10, ¶ 4; Dkt. No. 42-4, ¶ 9). In the course of their email exchange, Borello inquired about Plaintiff's age for alcohol service purposes, and Plaintiff responded that she was "a young 47 yr old hard worker." (Dkt. No. 42-10, ¶ 5; Dkt. No. 42-4, ¶ 10). Borello interviewed Plaintiff at the Restaurant and described the job requirements, including bar and food service. (Dkt. No. 44-1, ¶¶ 15–18). Borello also advised Plaintiff that the Restaurant closed down in December and reopened for business in the spring. (*Id.* ¶ 19). At the conclusion of the interview, Borello offered Plaintiff the job, and Plaintiff accepted.[13] (*Id.* ¶ 21). Borello trained Plaintiff, (Dkt. No. 42-8, at 310), and in October 2014 Plaintiff started working at the Restaurant, (*id.* at 40).

Plaintiff worked weekdays—Mondays through Fridays, from 9 a.m. to 6 p.m.—while Borello, who was a full-time schoolteacher during the week, worked on weekends. (Dkt. No. 42-10, ¶¶ 8–9; Dkt. No. 50, ¶ 3). Plaintiff earned $5 per hour, plus tips. (Dkt. No. 50, ¶ 3). She usually worked with Defendant Rodriguez, who served as the Restaurant's main cook but held himself out as the Restaurant's owner. (Dkt. No. 44-1 ¶ 23; Dkt. No. 42-8, at 76, 81, 180–81,

---

[13] No Golf Course owner or employee was involved in the interviewing or hiring of Plaintiff or any other Restaurant employee. (*See* Dkt. No. 44-1, ¶ 22).

323). Additionally, Plaintiff viewed Defendant Rodriguez as her manager. (Dkt. No. 42-8, at 181). He would pay her wages, other than tips. (*Id.* at 77–78). She would inform him if she could not work one of her shifts. (*Id.* at 165). And he would ask that "a certain amount of people" work specific shifts; the servers would decide among themselves who would work which days. (*Id.* at 122–23). The Restaurant and Golf Course shut down for the winter in December 2014. (Dkt. No. 42-8, at 75; Dkt. No. 57, ¶ 5).

### C.   2014/2015 Seasonal Work at Amenia

According to Plaintiff's testimony, in fall 2014, Borello had told her that Defendant Rodriguez "was opening a steak house," and that Plaintiff could work there "in the in-between season" if she wanted to. (Dkt. No. 42-8, at 90–91). Plaintiff further testified that, as the season went on, Defendant Rodriguez told her he was "shorthanded" at the steak house and "didn't have enough staff," and he asked her if she "wanted to make extra money." (*Id.* at 91). Plaintiff accepted the offer and started working at the Amenia steak house as a waitress and bartender in November 2014, while she was still working at the Apple Greens Restaurant. (*Id.* at 91–93). When the Apple Greens Restaurant closed down for the season, Plaintiff started working at Amenia full time, five to six days a week. (*Id.* at 95, 100).

According to Plaintiff, Defendant Rodriguez was the "head cook" at Amenia.[14] (*Id.* at 94). He also managed the business and initially paid employees in cash. (*See id.* at 117–18; Dkt. No. 48-3; Dkt. No. 48-4, ¶ 8; Dkt. No. 48-5). Plaintiff testified that, at Defendant Rodriguez' invitation, she hired her daughter Kerri Spiegel to work at Amenia full time in December 2014. (Dkt. No. 42-8, at 101–02). Plaintiff likewise hired her daughter Caroline Spiegel for a part-time position at Amenia. (*Id.* at 113). Plaintiff worked at Amenia until the end of March 2015, as the

---

[14] Defendant Rodriguez disputed that account, testifying that he was only a customer at Amenia and never worked there. (Dkt. No. 46-2, at 54–57, 68–69).

Restaurant and the Golf Course were reopening at the beginning of April 2015. (Dkt. No. 42-8, at 95, 140–41; Dkt. No. 57, ¶ 5). Plaintiff was not terminated from Amenia, (Dkt. No. 42-10, ¶ 15); instead, she left to return to work at the Restaurant because the hours and days were better and more consistent than at the steak house, (Dkt. No. 42-8, at 96). Plaintiff did not work at Amenia again after March 2015. (Dkt. No. 42-10, ¶ 13).

### D.     2015 Seasonal Work at the Apple Greens Restaurant

When she returned to the Restaurant in April 2015, business was slow, but it picked up in May, at which point Plaintiff was "back to working full-time." (*See* Dkt. No. 42-8, at 147, 151). Plaintiff's paychecks were signed by Intrieri. (Dkt. No. 42-8 at 148–49).

At the end of June or early July 2015, Borello, who did not teach during the summer, asked Plaintiff if she would trade a weekday shift for one of Borello's weekend shifts, but Plaintiff declined. (Dkt. No. 42-10, ¶ 17; Dkt. No. 57, ¶ 14; Dkt. No. 42-8, at 314). Plaintiff felt that she should not have to "keep switching days because [Borello was] off from school." (Dkt. No. 42-8, at 191). According to Plaintiff, Defendant Rodriguez initially reassured her that Borello was "not taking any days," as Borello "had enough shifts." (*Id.* at 190, 192). Eventually, however, Borello ended up taking Plaintiff's Thursday shift. (*Id.*).

At her deposition, Plaintiff explained that she learned about the shift change because Defendant Rodriguez "came in talking about it" after "sitting outside with Dave and Judy [Roehrs]." (*Id.* at 189). She remembered that Defendant Rodriguez "came in all pissed off and said [Borello] is taking one of your shifts, she is quicker than you, and you need a day off anyway, you're older." (*Id.*). Plaintiff could not explain Defendant Rodriguez's reversal, (*id.* at 187), but she surmised that Mr. Roehrs had a role in the shift change:

> Q.   And what do you think Mr. Roehrs' input was?
> A.   I don't really know what happened. I saw them all talking outside. I don't know what he said.

> Q.   So you don't—
> A.   I can't say what he said, but I know whatever he said made
>       Justin angry.
> Q.   Okay. And did Justin tell you what he said?
> A.   No.
> Q.   How do you know what Mr. Roehrs [sic] made Justin angry?
> A.   Because I saw him come through the door and he was pissed
>       off.
> . . . .
> Q.   What did he do that made you think he was pissed off? Was
>       it his tone, did he throw something; what did he do?
> A.   His tone, he was pissed off, you know, he was speaking
>       loudly. I mean, he was pissed off.

(Dkt. No. 42-8, at 192–93).

Text messages between Plaintiff and Borello indicate that they had a strained work relationship. (*See generally* Dkt. No. 42-6). For example, on August 19, 2015, Borello asked Plaintiff why she was not "put[ting] stock away," noting that it was "part of the job"; Plaintiff responded that she did, and Borello replied, "You actually don't. It will be here for you to put away Friday. And if it isn't I'll find someone who will do what they have to do here. Everything you are asked to do, you stop doing. It's ridiculous." (*Id.* at 3–4). In her declaration submitted in support of summary judgment, Borello states that Plaintiff "was not a good employee" and that she "constantly failed to do her side work including the stocking of coolers, would cut her shifts short, would show up for work late, would drink alcohol during her shift, leave the doors unlocked, leave the air conditioning running and take alcohol from the Restaurant at the end of the night." (Dkt. No. 42-4, ¶ 20). Plaintiff disputes these assertions, stating that she "was always a good employee and never received any discipline due to performance issues or issues of insubordination," and that she "never received any verbal or written warnings, nor any write-ups, from management." (Dkt. No. 48-2, ¶ 2).

### E.   Age-Related Comments

It is undisputed that no one at the Restaurant made any comments in 2014 about Plaintiff's age or about needing younger staff. (Dkt. No. 44-1, ¶ 36). Likewise, it is uncontroverted that Intrieri, Rifenburgh, and Borello never made comments about Plaintiff's age. (Dkt. No. 42-10, ¶ 21). Plaintiff, however, testified that Defendant Rodriguez started making age-related comments to her while she worked at Amenia. (Dkt. No. 42-8, at 111). Asked to describe the first time such comments were made, Plaintiff recounted the conversation as follows:

> Put your glasses on, you need them to read, don't you need them to read, he would say, especially if we got really, really busy, he's like hurry up, old lady, got to keep up, got to keep up. He would be yelling from the kitchen, because, like I said, we were really short-staffed a lot and the food would start piling up in the back, and he's like, hurry up, you're old, get the food out, it has got to go out, and we were always backed up because we didn't have enough workers.

(*Id.* at 112–13; *see also* Dkt. No. 48-2, ¶ 6). Plaintiff also recalled that Defendant Rodriguez made age-related comments to another Amenia server who was a couple of years younger than her. (Dkt. No. 42-8, at 114).

Initially, although she found the age-related comments "offensive and hurtful," Plaintiff did not complain because she was "not comfortable standing up for [herself]," as she was "a relatively new employee" and "hoped it wouldn't continue." (Dkt. No. 48-2, ¶ 7). After she returned to the Restaurant in 2015, "Defendant Rodriguez's comments to [her] about [her] age became more frequent during the summer time," and "he began regularly commenting on her need to wear reading glasses" and stated that Plaintiff should be put in a nursing home. (*Id.* ¶ 8). He made "offensive comments" about Plaintiff's age two to three times per week between summer 2015 and her last day of work. (*Id.*).

Defendant Rodriguez made similar comments about Plaintiff's age to her daughters Kerri Spiegel and Caroline Spiegel. (Dkt. No. 48-4, ¶¶ 12–18; Dkt. No. 48-5). For example, he would ask Kerri Spiegel when she was "taking [her] Mom to Florida" because that is where "old people belong." (Dkt. No. 42-8, at 245–46). When Plaintiff would come to work later in the day, Defendant Rodriguez would ask Kerri Spiegel if "that old lady was going to make it out of bed." (Dkt. No. 48-4, ¶ 13). He used to tell Kerri Spiegel that "we need to find an older rich man for your mother because she's too old to work." (*Id.* ¶ 16). Additionally, Defendant Rodriguez told Kathleen Colletti, another employee of the steak house, that, when she wore her glasses on her head, she looked "old like Theresa," referring to Plaintiff. (Dkt. No. 48-3).

Besides age-related comments, Plaintiff testified that Defendant Rodriguez treated her differently because of her age. (Dkt. No. 42-8, at 202). She mentioned that he "didn't really want [her] out on the golf carts for outings because there were younger girl[s]" available. (*Id.*; *see also* Dkt. No. 48-4, ¶ 15).

Beginning around September 2015, Plaintiff started objecting and complaining to Defendant Rodriguez in response to his age-related comments. (Dkt. No. 48-2, ¶ 9). She told him, "[S]top calling me old, I look good for my age. I'm just as quick as all of the younger people here." (Dkt. No. 42-8, at 171). Plaintiff would also say, "[S]top making fun of me. . . . [Y]ou're going to be my age sometime, you are old, you're getting old, you know." (*Id.* at 256). She referred to him as an "old guy," (*id.* at 254–55), but it was merely a reference to the way in which he would taunt her, (Dkt. No. 48-2, ¶ 10). Plaintiff did not perceive these conversations as playful banter. (Dkt. No. 42-8, at 256). She objected to his age-related comments on a weekly basis. (Dkt. No. 48-2, ¶ 9).

16

### F.    Termination

At the end of the Restaurant's winter season in December 2015, Plaintiff, who wanted to return in the spring, asked Defendant Rodriguez whether she would be coming back, and he said, "[Y]es, I will see you in the spring." (Dkt. No. 42-8, at 181, 334). Plaintiff also asked about working at Amenia, but he told her there was no vacancy at the steak house. (*See id.* at 97–98).

The Golf Course and the Restaurant reopened in February 2016. (Dkt. No. 57, ¶ 54). Defendant Rodriguez, however, ignored Plaintiff's calls and text messages seeking to resume working at the Restaurant. (*Id.* ¶ 55). On February 28, 2016, Borello sent Plaintiff the following text message:

> Hi Theresa, I'm not sure if you still have my number, but if not this is Jacquelyn from apple greens. I hope you had a nice winter. I know you have been wondering about this year so I just wanted to get in touch with you regarding this season. Unfortunately it really didn't work out last year so we do not plan on bringing you back to work. I apologize and wish you luck.

(Dkt. No. 42-6, at 14).

According to Defendants, in February 2016, Borello, Intrieri, and Rifenburgh met to discuss opening the Restaurant for the season, and they decided not to bring Plaintiff back because of Plaintiff's "conduct during the 2015 season."[15] (Dkt. No. 42-4, ¶ 29; *see also* Dkt. No. 42-1, ¶¶ 28–29). Plaintiff believes that the Restaurant did not rehire her because of her age "due to the fact that [Defendant Rodriguez] called [her] old all the time and [she] was the oldest person working there." (Dkt. No. 42-8, at 174). Further, Plaintiff asserts that her termination was the result of her complaining to Defendant Rodriguez about his age-related comments. (Dkt. No. 50, ¶ 46, at 10; *see* Dkt. No. 42-8, at 170–71, 256).

---

[15] Defendants assert that no Golf Course owner or employee participated in the decision not to rehire Plaintiff. (*See* Dkt. No. 44-1, ¶¶ 41, 68; Dkt. No. 42-4, ¶ 6; Dkt. No. 44-4, ¶ 19).

### III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome

a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)

(quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere

conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact

where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting

*Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION

The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge

any individual or otherwise discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C.

§ 623(a)(1). In relevant part, the "term 'employer' means a person engaged in an industry

affecting commerce who has twenty or more employees for each working day in each of twenty

or more calendar weeks in the current or preceding calendar year." *Id.* § 630(b). Thus, a

"business must have at least twenty 'employees' to be an 'employer'" subject to the ADEA's

requirements. *Morelli v. Cedel*, 141 F.3d 39, 44 (2d Cir. 1998) (quoting 29 U.S.C. § 630(b)). The

"twenty-employee minimum is an element of a claim under the ADEA," *Downey v. Adloox Inc.*,

238 F. Supp. 3d 514, 524 (S.D.N.Y. 2017), which the plaintiff bears the burden of proving. The

current "calendar year" is the period between January and December of the year in which the

alleged violation occurred. *See Rogers v. Sugar Tree Prod., Inc.*, 7 F.3d 577, 580 (7th Cir. 1993),

*abrogated on other grounds by Papa v. Katy Indus., Inc.*, 166 F.3d 937 (7th Cir. 1999); *see also*

*Centeno v. 75 Lenox Realty LLC*, No. 14-cv-1916, 2017 WL 9482090, at *11 n.19, 2017 U.S.

Dist. LEXIS 15008, at *29–30 n.19 (E.D.N.Y. Feb. 1, 2017) (assessing whether the employee

minimum requirement was met either in the year when the alleged acts occurred or in the

preceding year), *report and recommendation adopted*, 2017 WL 1214451, 2017 U.S. Dist. LEXIS 50819 (E.D.N.Y. Mar. 31, 2017).

To determine whether "an employer 'has' an employee on any working day," the relevant inquiry is whether "the employer has an employment relationship with the individual on the day in question." *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 206–07 (1997) (adopting the so-called "payroll method" to determine the number of individuals employed by a defendant in Title VII cases, and noting that this method "has also been adopted by the EEOC under the Age Discrimination in Employment Act of 1967, which defines 'employer' in precisely the way Title VII does"). The focus is on "whether the employer has an employment relationship with the employee on the day in question, and not whether the employee actually performs work or receives compensation on the day in question." *Frederick v. United Bhd. of Carpenters & Joiners of Am. (UBCJA) Local 926*, 558 F. App'x 83, 86 (2d Cir. 2014).

While "the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll," "what is ultimately critical . . . is the existence of an employment relationship, not appearance on the payroll; an individual who appears on the payroll but is not an 'employee' under traditional principles of agency law would not count toward the . . . minimum." *Walters*, 519 U.S. at 206, 211 (citation omitted); *Keller v. Niskayuna Consol. Fire Dist. 1*, 51 F. Supp. 2d 223, 230–31 (N.D.N.Y. 1999) (observing that "*Walters* does not establish that only a wage or salary will establish an 'employment relationship'"). Under the payroll method, employees are counted so long as they are on the employer's payroll, even if they do not work or get paid in a particular week. *See Walters*, 519 U.S. at 207, 211–12. Thus, "an employee who works irregular hours, perhaps only a few days a month, will be counted toward the 15-employee minimum for every week in the month." *Id.* at 210. Put simply, "all one

needs to know is whether the employee started or ended employment during that year and, if so, when. He is counted as an employee for each working day after arrival and before departure." *Id.* at 211.

### A.    Restaurant and Amenia

Defendants Restaurant and Amenia assert that the alleged violation occurred in March 2016, when she was "terminated"; therefore, they argue that the relevant time period under the ADEA (i.e., the period spanning the current and preceding calendar years) is 2015–2016. (Dkt. No. 42-11, at 13 (quoting Dkt. No. 4, ¶ 46)). Although Plaintiff did not contest that point in her opposition, she asserts in her supplemental briefing that the alleged discriminatory acts occurred in 2015 and 2016, and therefore that 2014, 2015, and 2016 are the relevant years for analyzing whether the 20-employee minimum is satisfied. (Dkt. No. 65, at 6). For summary judgment purposes, the Court will analyze whether the employee-minimum threshold requirements are satisfied in each of the three years in question.

Plaintiff contends that the Restaurant and Amenia are an integrated employer and together have more than 20 employees; thus, according to Plaintiff, the Restaurant and Amenia jointly satisfy § 630(b)'s 20-employee minimum. (Dkt. No. 52, at 18–20). Defendants challenge this view and note that, even if the employees of Restaurant and Amenia are aggregated for § 630(b) purposes, the record evidence shows that they had less than 20 employees during the relevant time period. (Dkt. No. 42-11 at 13–14).

### 1.    Number of Employees in 2014

For 2014, the only evidence before the Court is deposition testimony from Plaintiff and Intrieri about the number of employees at the Restaurant and Amenia in fall 2014. Plaintiff testified that, when she worked at the Restaurant in October and November 2014, "it was just [Defendant Rodriguez] and [her]self the majority of the time," although she occasionally worked

with two other individuals, Fernando Linares and David Soto. (Dkt. No. 42-8, at 74–75). Intrieri testified that there were "about seven" workers at Amenia when the steak house opened in September 2014. (Dkt. No. 44-3, at 45). Therefore, there were at most 11 employees working at the Restaurant and Amenia in fall 2014. In December 2014, only Amenia was open, and it is undisputed that Amenia did not have 20 or more employees in December 2014. Accordingly, there can be no genuine dispute about the fact that the combined restaurants did not satisfy the threshold number of employees in 2014.

### 2.    Number of Employees in 2015

Only Amenia was open from January to March 2015. Since Plaintiff does not assert that Amenia ever had 20 or more employees, it follows that the employee-minimum threshold cannot be satisfied for any week during this three-month period. Further, even assuming that the Restaurant could have employees while it was closed and that the employees it had in 2014 were on the payroll during the months it was closed, the employee minimum would still not be met. Plaintiff testified that she worked with Jacquelyn Borello, Defendant Rodriguez, Fernando Linares, and David Soto at the Restaurant in October and November 2014; and she specified that no other servers or bartenders worked at the Restaurant during that time. (*See* Dkt. No. 42-8, at 49–55, 74–75). Since Plaintiff's list of individuals who worked at Amenia between December 2014 and March 2015 already includes Defendant Rodriguez, Fernando Linares, and David Soto, (*see* Dkt. No. 64-2, ¶ 5), counting these three individuals as Restaurant employees during the January–March 2015 period does not change Plaintiff's tally. And adding Jacquelyn Borello to Plaintiff's list—which has 18 individuals excluding Intrieri (as to Intrieri's treatment as a nonemployee owner, see below)—yields a total of 19 employees combined.

Plaintiff left Amenia at the end of March 2015 and resumed working at the Restaurant in April 2015. She submitted evidence, including deposition testimony and affidavits, about the

number of individuals who worked at the Restaurant from April to December 2015. She did not, however, proffer evidence of the number of individuals who worked at Amenia during that time; the only such evidence comes from Defendants' paycheck records.

Plaintiff claims that she worked with 10 other individuals at the Restaurant in 2015. But one of the individuals she lists is Maria Intrieri, the owner of the Restaurant. Under controlling precedent, analyzing whether an owner is an employee must "focus on the common-law touchstone of control." *Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 449–50 (2003). Courts consider, among relevant factors, whether: (1) "the organization can hire or fire the individual or set the rules and regulations of the individual's work"; (2); "the organization supervises the individual's work," and, if so, to what extent; (3) "the individual reports to someone higher in the organization"; (4) "the individual is able to influence the organization," and, if so, to what extent; (5) "the parties intended that the individual be an employee, as express in written agreements or contracts"; and (6) the individual shares in the profit, losses, and liabilities of the organization." *Id.* (quoting EEOC Compliance Manual § 605:0009). Plaintiff has not presented evidence supporting any of these six factors. If anything, the record indicates that Intrieri was a nonemployee owner of the Restaurant as well as Amenia. (*See* Dkt. No. 42-8, at 75–76, 116–17 (Plaintiff testifying that Intrieri did not have a role at the Restaurant or Amenia and that she was "never an active owner"); Dkt. No. 44-3, at 44 (Intrieri testifying that she "was the owner" at Amenia and "was there not doing any work but to make sure everything was functioning properly")). Accordingly, Intrieri cannot be counted toward the employee-minimum threshold. *See Fitzgibbons v. Putnam Dental Assocs., P.C.*, 368 F. Supp. 2d 339, 343 (S.D.N.Y. 2005) (finding that a sole shareholder of a dental practice was not an employee under Title VII).

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the Court accepts as true Plaintiff's assertions that seven of the listed individuals—Defendant Rodriguez, Javier Padilla, Germania Soto, Guzman Soto, Jacquelyn Borello, Justin Swisher, and Katlyn—worked at the Restaurant the entire time from April to December 2015; that Caroline Spiegel worked there from August to October 2015; and that Kerri Spiegel worked there from April to August 2015. (*See* Dkt. No. 64-2, ¶¶ 9–11). Further, because Caroline and Kerri Spiegel worked at Amenia before April 2015, and crediting all reasonable inferences in favor of Plaintiff, the Court will count them as having been continuously employed by the purported joint enterprise until their last month of employment. *See Walters*, 519 U.S. at 207, 211–12 (explaining that, under the payroll method, an individual is "counted as an employee for each working day after arrival and before departure," whether or not she worked or was paid). Therefore, the Court counts Caroline Spiegel as an employee of the Restaurant from April to October 2015, and Kerri Spiegel as an employee of the Restaurant from April to August 2015.

For Amenia's employee headcount, the Court draws the same reasonable inferences in favor of Plaintiff.[16] According to her supplemental declaration, Plaintiff worked with David Soto, Oscar Hernandez, and a hostess named Caroline at Amenia between December 2014 and

---

[16] Plaintiff argues that Defendants' paycheck records are incomplete because some of the individuals she remembers working with do not appear in the records. (*See* Dkt. No. 65, at 7–10). But Plaintiff left Amenia at the end of March 2015, and she has not proffered evidence of who worked at Amenia after she left. At any rate, the Court has accounted for the possibility that the records are incomplete by: (1) crediting Plaintiff's evidence of the number of employees at the Restaurant during the April–December 2015 period, including employees who were not listed in Defendants' records; and, as described above, (2) supplementing Amenia's paycheck records by inferring that the employees who worked at Amenia before April 2015 according to Plaintiff and received paychecks during the April–December 2015 period according to the records were continuously employed. That leaves only four employees that Plaintiff recalls worked at Amenia before she left in March 2015 who are not on the Court's chart: two servers (Jeanie and Christine Pizzuti); a host/busser (Aryanna Lawrence); and a manager (Jenny). Even if a jury could infer that Amenia continued employing these individuals through some date beyond March 2015, absent any record evidence, the jury would have to engage in pure speculation to find that the two entities combined had "twenty or more employees for each working day in each of twenty or more calendar weeks." 29 U.S.C. § 630(b).

March 2015. (*See* Dkt. No. 64-2, ¶ 5). Because Defendants' paycheck records for Amenia show that David Soto received paychecks in May 2015, the Court counts him as an employee of Amenia from April to May 2015. (*See* Dkt. Nos. 66-3, 66-4). Similarly, because Oscar Hernandez received paychecks from July to December 2015, the Court counts him an employee of Amenia from April to December 2015. (*See id.*). Defendants' records show that a Caroline Berghahn received paychecks in July and August 2015. (*See id.*). Crediting Plaintiff's assertion that a hostess with the same first name worked at Amenia before April 2015, the Court counts her as continuously employed from April to August 2015. In addition to these three individuals, Defendants' records show that five individuals[17]—Geraldine Rifenburgh, Fernando Linares, Michelle Mayer, Geremy Mayer, and George Mayer—received paychecks from April to December 2015, that Dana Decker was paid in May 2015, and that Jorge Luis Crisanto received paychecks from May to December 2015. (*See id.*).

　　All in all, this evidence, viewed in the light most favorable to Plaintiff with all reasonable inferences drawn in her favor, shows the following number of employees at the purported joint enterprise formed by the Restaurant and Amenia from April to December 2015:

---

[17] The records also indicate that Javier Padilla received paychecks from Amenia from May to December 2015, (*see* Dkt. Nos. 66-3, 66-4), but the Court has already counted him as an employee of the Restaurant.

|  | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 |
|---|---|---|---|---|---|---|---|---|---|
| Theresa Geraci | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Justin Rodriguez | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Jacquelyn Borello | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Javier Padilla | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Germania Soto | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Guzman Soto | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Justin Swisher | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Katlyn | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Caroline Spiegel | 1 | 1 | 1 | 1 | 1 | 1 | 1 | - | - |
| Kerri Spiegel | 1 | 1 | 1 | 1 | 1 | - | - | - | - |
| David Soto | 1 | 1 | - | - | - | - | - | - | - |
| Oscar Hernandez | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Caroline Berghahn | 1 | 1 | 1 | 1 | 1 | - | - | - | - |
| Geraldine Rifenburgh | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Fernando Linares | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Michelle Mayer | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Geremy Mayer | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| George Mayer | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Dana Decker | - | 1 | - | - | - | - | - | - | - |
| Jorge Luis Crisanto | - | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| **TOTAL** | 18 | 20 | 18 | 18 | 18 | 16 | 16 | 15 | 15 |

As the chart shows, the only month when the Restaurant and Amenia together employed 20 workers was May 2015. Even interpreting all of the evidence in the light most favorable to Plaintiff, and allowing for some leeway in delineating time periods—for example, by inferring that the four individuals not on this chart, whom Plaintiff identified as Amenia employees as of March 2015, continued working at Amenia through some later date (*see supra* note 16)—no reasonable jury could find on the record evidence that Plaintiff has met the 20-week, 20-employee minimum. Plaintiff argues that Defendants' records are incomplete, but the 20-employee minimum is an element of a claim under the ADEA," *Downey v. Adloox Inc.*, 238 F. Supp. 3d 514, 524 (S.D.N.Y. 2017), which a plaintiff bears the burden of proving. Plaintiff has failed to raise a genuine issue of fact as to this element of her case for the year 2015.

### 3.      Number of Employees in 2016

The only evidence before the Court regarding the number of employees in 2016 comes from Defendants' paycheck records. Plaintiff concedes that these records do not show that Defendants met the 20-employee minimum. (Dkt. No. 65, at 9). These show that, at a maximum, the two restaurants had 18 workers on their staff at any one time during that year. (*See* Dkt. Nos. 66-2, 66-3, 66-4). Thus, Plaintiff has failed to raise a genuine dispute of material fact concerning the number of employees who worked at the Restaurant and Amenia in 2014, 2015 and 2016. The Court concludes that the Restaurant and Amenia, taken separately or together, are not employers subject to liability under the ADEA.

### B.      Restaurant and Golf Course

Whereas neither the Restaurant nor Amenia satisfies the 20-employee minimum, the Court assumes the Golf Course alone had more than 20 employees during the relevant period.[18] Plaintiff argues that the Restaurant and the Golf Course are an integrated employer for § 630(b) purposes and therefore both subject to liability under the ADEA.[19] (*See* Dkt. No. 52, at 16–20). Defendants demur, arguing that the "Restaurant and the Golf Course are in all respects separate businesses." (Dkt. No. 44-2, at 7).

Under Title VII—which, like the ADEA, applies only to employers with a threshold number of employees—a plaintiff may assert an employment discrimination claim against an

---

[18] Although the parties did not put forth evidence concerning the number of employees at the Golf Course during the relevant period, Defendants did not counter Plaintiff's assertion that the Golf Course had more than 20 employees. (*Compare* Dkt. No. 49, at 11, *with* Dkt. No. 58).

[19] The Court notes that Plaintiff does not specifically argue that the Restaurant and the Golf Course are a "joint employer." Under the joint employer doctrine, which is distinct from the integrated enterprise doctrine, a joint employer relationship "involves separate legal entities that 'handle certain aspects of their employer-employee relationship jointly.'" *Griffin v. Sirva Inc.*, 835 F.3d 283, 292 (2d Cir. 2016) (quoting *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir. 1985)). "A joint employer relationship may be found to exist where there is sufficient evidence that the respondent had immediate control over the other company's employees." *NLRB v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir. 1994). As discussed below, *see infra* Part IV.B.2, Plaintiff has not raised a triable issue of fact concerning the Golf Course' control over the Restaurant's employees.

entity other than her direct employer if that entity and her direct employer are an "integrated enterprise." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000) ("To prevail in an employment action against a defendant who is not the plaintiff's direct employer, the plaintiff must establish that the defendant is part of an 'integrated enterprise' with the employer, thus making one liable for the illegal acts of the other."). Although the parties disagree whether this "integrated enterprise" doctrine applies in ADEA cases, (*compare* Dkt. No. 44-2, at 11, *with* Dkt. No. 49, at 11–14), Defendants argue that, in any event, the Restaurant and the Golf Course are not an integrated enterprise. (Dkt. No. 44-2, at 12).

Under the Second Circuit's integrated enterprise test, two separate entities "cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014) (quoting *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)).[20] "Although no one factor is determinative . . . control of labor relations is the central concern." *Id.* (quoting *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996)). The Court examines each factor in turn below.

### 1.      Interrelation of Operations

To determine whether two entities' operations are interrelated, courts examine whether: (1) one entity is involved in the other's daily production, distribution, marketing, and advertising decisions; (2) the entities share employees, services, records, and equipment; (3) the entities commingle bank accounts, inventories, and lines of credit; (4) one entity maintains the other's

---

[20] Although the integrated enterprise test typically applies to parent–subsidiary relationships, courts have applied it outside of that context. *See Centeno v. 75 Lenox Realty LLC*, No. 14-cv-1916, 2017 WL 9482090, at *10, 2017 U.S. Dist. LEXIS 15008, at *27 (E.D.N.Y. Feb. 1, 2017), *report and recommendation adopted*, 2017 WL 1214451, 2017 U.S. Dist. 50819 (E.D.N.Y. Mar. 31, 2017).

books; (5) one entity issues the other's paychecks; and (6) one entity prepares and files tax returns for the other. *See Ferguson v. New Venture Gear, Inc.*, No. 04-cv-1181, 2009 WL 2823892, at *2, 2009 U.S. Dist. LEXIS 78111, at *6–7 (N.D.N.Y. Aug. 31, 2009).

It is undisputed that the Restaurant and the Golf Course do not share employees and that they maintain entirely separate payroll systems, employee records, and insurance. (Dkt. No. 44-1, ¶ 75; Dkt. No. 50, ¶¶ 62–64). Additionally, there is no evidence that the Golf Course was involved in the Restaurant's day-to-day operational decisions, that the Golf Course maintained the Restaurant's books, or that the Golf Course filed the Restaurant's tax returns. Although the record shows that the Golf Course was the Restaurant's landlord, (Dkt. No. 44-4, ¶ 6), that the Restaurant provided food and beverages to golfers for the Golf Course's outings, (Dkt. No. 42-8, at 58, 87, 347–49), and that the Golf Course charged the Restaurant a 10-percent fee for catering events on the Golf Course's grounds, (Dkt. No. 44-1, ¶ 56), these facts, even viewed in the light most favorable to Plaintiff, do not suggest the lack of an arm's-length relationship between the two entities, *see Lihli Fashions Corp., Inc. v. NLRB*, 80 F.3d 743, 747 (2d Cir. 1996) ("Ultimately, single employer status depends on all the circumstances of the case and is characterized by absence of an arm's length relationship found among unintegrated companies." (internal quotation marks omitted)).

Plaintiff nevertheless argues that the Restaurant and the Golf Course had interrelated operations because "the Restaurant regularly used the Golf Course's equipment" when Restaurant employees delivered drinks to golfers using the Golf Course's carts. (Dkt. No. 49, at 15). More generally, Plaintiff testified that the Restaurant would close when the Golf Course was closed. (*See id.* at 86–87).[21] Even if credited, this evidence does not raise triable issues of fact

---

[21] Plaintiff also testified that, when the Golf Course was closed to "outside golfers" during big outings, the Restaurant would only serve outing patrons. (*See* Dkt. No. 42-8, at 349).

concerning interrelated operations. The fact that the Restaurant's business hours were affected by the Golf Course's schedule is unremarkable, given the Restaurant's location inside the Golf Course. Further, the record indicates that the Restaurant's use of a "beverage cart" was permitted under the lease between the Restaurant's owner and its corporate landlord. (Dkt. No. 44-4, at 11); *see Swallows v. Barnes & Noble Book Stores*, Inc., 128 F.3d 990, 994 (6th Cir. 1997) (explaining that the provisions by which "Barnes & Noble paid TTU for the use of its building and for utilities" and "received maintenance services from TTU" were "nothing more than standard contractual lease terms" and did "not show interrelation of operations"). In any event, regardless of who owned the beverages carts, the record is clear that the Restaurant and the Golf Course operated within their respective spheres, and that the role of Restaurant employees was to serve food and beverages only. (*See* Dkt. No. 42-8, at 58, 87). Contrary to Plaintiff's contention, (*see* Dkt. No. 49, at 15), the fact that golfers tipped Restaurant employees for drinks does not mean that Restaurant employees were paid by the Golf Course. Also, it is undisputed that Plaintiff's paychecks were issued by the Restaurant, not the Golf Course, (*see* Dkt. No. 42-8 at 148–49), and that the Golf Course did not receive any of the profits from the Restaurant's sale of beverages to golfers. (Dkt. No. 44-1, ¶ 55).

Lastly, Plaintiff argues that "the Golf Course enforced a dress code at the Restaurant." (Dkt. No. 49, at 15). The evidence for that proposition is muddled, as Plaintiff herself testified that the Restaurant did not require employees to wear a uniform and that she was free to wear what she wanted. (Dkt. No. 42-8, at 335). Nevertheless, viewing the evidence in the light most favorable to Plaintiff, the Court credits Plaintiff's testimony that Ms. Roehrs "didn't want anybody wearing provocative clothes" inside the Restaurant. (*Id.* at 336–37; *see also* Dkt. No. 51-4, ¶ 20). Even assuming that the Golf Course enforced its dress code on all persons inside the

property, including Restaurant employees, that fact does not establish interrelated operations under the circumstances of this case. *Cf. Narjes v. Absolute Health Servs., Inc.*, No. 17-cv-739, 2018 WL 3208180, at *5 (N.D. Ohio June 29, 2018) (rejecting, in an analogous FLSA case, the argument that a defendant's "statements concerning Plaintiff's failure to adhere to the dress code" was "proof of interrelated operations" between the defendant and the plaintiff's employer).

Because evidence of interrelated operations is lacking, this factor does not support a finding that the Golf Course was Plaintiff's employer. *See Herman v. Blockbuster Entm't Grp.*, 18 F. Supp. 2d 304, 309 (S.D.N.Y. 1998) (finding that Blockbuster's performance of "management services," including payroll processing and information technology, for another company evidenced a "limited interrelationship" which was "insufficient to support a finding of interrelated operations," given that "[m]ost significant operations at the two corporations were separate and distinct"), *aff'd*, 182 F.3d 899 (2d Cir. 1999).

## 2. Centralized Control of Labor Relations

Centralized control of labor relations includes "tasks such as handling job applications, approving personnel status reports, and exercising veto power over major employment decisions." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000); *see also Laurin v. Pokoik*, No. 02-cv-1938, 2004 WL 513999, at *6, 2004 U.S. Dist. LEXIS 4066, at *19 (S.D.N.Y. Mar. 15, 2004) ("Centralized control over labor relations, the most important prong in the single-employer inquiry, can include such factors as whether the companies have separate human resources departments and whether the entity establishes its own policies and makes its own decisions as to the hiring, discipline, and termination of its employees." (internal quotation marks omitted)). "In determining whether a plaintiff adequately alleges centralized control over labor relations . . . the central question is '[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?'" *Brown*, 756 F.3d at 227

(alteration in original) (quoting *Cook,* 69 F.3d at 1240). Although a "plaintiff need not demonstrate that the [separate entity] exercises 'day-to-day control' over labor relations," she must show that the separate entity's "involvement 'is sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions.'" *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 156–57 (2d Cir. 2014) (first quoting *Solis v. Loretto-Oswego Residential Health Care Facility*, 692 F.3d 65, 76–77 (2d Cir. 2012); then quoting *Cook*, 69 F.3d at 1241).

It is uncontested that the Restaurant and the Golf Course do not have shared employees, that they maintain entirely separate payroll systems, employee records, and insurance, and that the Golf Course was not consulted with regard to the Restaurant's decisions to hire and not rehire Plaintiff. (Dkt. No. 50, ¶¶ 62–64, 66–68, 75). Plaintiff also acknowledges that Mr. Roehrs, one of the Golf Course's owners, did not have a human resources management role at the Restaurant. (Dkt. No. 42-8, at 337–38). Yet Plaintiff contends that the Golf Course "controlled" her schedule and that it "directed the Restaurant to take away Plaintiff's Thursday shift." (Dkt. No. 49, at 14–15). These contentions are unsupported by the record evidence. Plaintiff testified that the Golf Course did not "specifically set our schedule." (Dkt. No. 42-8, at 86). The fact that the Restaurant decided to close when the Golf Course was closed does not establish that the Golf Course controlled Restaurant employees' schedules; it merely indicates that the Restaurant's business was affected by the Golf Course's operations. Further, at her deposition, Plaintiff conceded that she did not have any personal knowledge of Mr. Roehrs' role in the Restaurant's decision to transfer Plaintiff's Thursday shift to Borello. (*See* Dkt. No. 42-8, at 192–93 (Plaintiff testifying concerning Mr. Roehrs' role, stating, "I don't really know what happened. I saw them all talking outside. I don't know what he said")).

Given the absence of evidence of centralized control of labor relations—the most important issue in the integrated enterprise analysis—this factor does not support a finding that the Golf Course was Plaintiff's employer.

### 3.     Common Management

Although Plaintiff argues that common management weighs in her favor, she does not identify any facts distinct from those she invokes in support of her argument about centralized control of labor relations. (*See* Dkt. No. 49, at 14–15). Thus, as discussed above, this factor does not support Plaintiff's claim.

### 4.     Common Ownership or Financial Control

The parties do not dispute that the Restaurant and the Golf Course have entirely separate ownership. (Dkt. No. 44-1, ¶¶ 12, 13). Further, there is no evidence that the Golf Course exercised any financial control over the Restaurant. Therefore, this fourth factor does not support a finding that the Golf Course was Plaintiff's employer.

In sum, Plaintiff has failed to raise a genuine issue of material fact as to whether the Restaurant and the Golf Course are a single integrated enterprise. Since there is no basis for aggregating Restaurant and Golf Course employees for purposes of the ADEA employee threshold, and since the Restaurant and Amenia do not meet the 20-employee minimum, the Court grants summary judgment in favor of the Entity Defendants on Plaintiff's ADEA claims.

### C.     Remaining State-Law Claims

Having dismissed the ADEA claims, the Court declines, in its discretion, to retain supplemental jurisdiction over Plaintiff's state-law claims. *See* 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (stating that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction

over the remaining state-law claims"). With the dismissal of the federal claims prior to the investment of significant judicial resources, the "traditional 'values of judicial economy, convenience, fairness and comity'" weigh in favor of declining to exercise supplemental jurisdiction. *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Cohill*, 484 U.S. at 350). Accordingly, Plaintiff's NYHRL claims are dismissed without prejudice.

## V.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motions for summary judgment (Dkt. Nos. 42, 44, 46) are **GRANTED**; and it is further

**ORDERED** that Plaintiff's ADEA claims (first and second causes of action) are **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's NYHRL claims (third, fourth, and fifth causes of action) are **DISMISSED without prejudice**.

**IT IS SO ORDERED.**

Dated:  March 27, 2019
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge